# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| Dwight Woodson and Cynthia Woodson, ) | Civil Action No.: |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **COMPLAINT** |
| ) | |
| The United States of America, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiffs, by and through their undersigned counsel, and complaining of Defendant United States of America, bring this action for the personal injuries inflicted by Defendant and/or its agents, servants, medical personnel, and other staff on the Plaintiff, Dwight Woodson, a United States military veteran, and his wife, Cynthia Woodson, in the following particulars:

## PARTIES

**Plaintiffs:**

1.  Plaintiffs, Dwight Woodson and Cynthia Woodson, are husband and wife and residents of the County of Greenville, State of South Carolina. They bring this action for personal injury, loss of consortium, and damages pursuant to the Federal Tort Claims Act 28 U.S.C. § 2671 and U.S.C. §§ 1331 and 1346(b) and S.C. Code Ann. § 15-75-20. Plaintiffs complied with the provisions of 28 U.S.C. § 2675(a) by filing a Form 95 prior to commencement of this action.

**Defendant:**

1

2. Defendant United States of America (hereinafter, "Defendant" or "USA") is a proper party to this action which is being brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et. seq.

3. The USA, by and through the Department of Veteran's Affairs ("V.A.") and its V.A. hospital in Columbia, South Carolina, particularly the William Jennings Bryan Dorn V.A. Hospital, is being sued for the actions or inactions of its attending physicians, nurses, and other staff. These attending physicians, nurses, or other staff are USA/Dorn's agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to Defendant USA.

4. Furthermore, Defendant's negligent acts, omissions, and liability includes that of its agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to its federal question jurisdiction as provided for by 28 U.S.C. §§ 1331 and 1346 and in compliance with 28 U.S.C. §§ 1346(b), 2671-2680 et. seq., commonly known as the "Federal Tort Claims Act," which vests exclusive subject matter jurisdiction of Federal Tort Claims litigation in United States Federal District Courts.

6. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district and division because a substantial part of the events or omissions giving rise to this claim occurred in this district.

7.      Plaintiffs submitted an administrative claim (Form 95) to the appropriate claims officer for a Veterans Administration tort claim.  A letter of denial was sent to Plaintiffs on October 31, 2019, which is less than six (6) months ago.  Accordingly, Plaintiffs are hereby exercising their option to file suit seeking judicial relief directly under the FTCA.

## CAPS AND DAMAGES

8.      The USA employs medical professionals who provide clinical care to patients through the VA.

9.      The USA has different medical specialties at different VA facilities, including, but not limited to, orthopedic, neurologic, radiologic, and oncologic services.

10.     Because the USA provides different services to its patients via different staff, it is subject to different occurrences of negligence, gross negligence, recklessness, and/or willful and wanton conduct.

11.     There are multiple breaches of the standards of care in this case and each breach (or occurrence) can be stacked to create several different "caps" (depending on what a judge ultimately decides).

12.     There are no actual caps on the medical malpractice allegations if Plaintiffs prove Defendant USA's (through its agents and/or employees) conduct was grossly negligent or reckless.

13.     As such, unlimited damages are available and/or recoverable on the medical malpractice claims articulated herein against Defendant USA.

14. In addition, because there are no caps on general or ordinary negligence in South Carolina, there is no limitation on the amount available or recoverable pursuant to Plaintiffs' general negligence claim.

## BACKGROUND / FACTS

15. Dwight Woodson and Cynthia Woodson, (hereinafter collectively "Plaintiffs"), are filing this action because of the negligence, recklessness, and/or gross negligence on the part of the United States of America and/or its agents and/or employees.

16. The claims contained herein arise out of substandard medical, nursing, ministerial, supervisory, general, and non-medical care provided to veteran Dwight Woodson by agents, servants, and employees of Dorn V.A. Hospital in Columbia, South Carolina.

17. Dwight Woodson was a 59-year-old white male with a past medical history significant for Gastroesophageal Reflux Disease and Skin Cancer, among other things. His past surgical history was significant for left knee meniscus surgery in 2002, discectomy and plate assay surgeries in 2012, and lower back surgery in 2004.

18. On February 1, 2017, Mr. Woodson presented to the Defendant VA Medical Center in Columbia, S.C., with complaints of regular, severe posterior and superior headaches and neck pain. He noted that he had a prior history of neck surgery, but that he had done well until two months prior. A physical exam was performed, and he was brought back on February 8, 2017 for x-rays of the cervical spine with obliques. There was noted to be "bilateral neural foramen narrowing" on the right at C5-C6 and C6-C7

and the left at C6-C7. It was further noted that the disc spacers appeared "well incorporated."

19.     Mr. Woodson returned to the Defendant VA Medical Center on February 21, 2017 for an MRI of the neck and spine without contrast. Dr. Michael Seshul reviewed the imaging and his findings were as follows: "upper and lower cervical osteoarthritis, no evidence of central neural compression or large disc. Neural foraminal narrowing." Mr. Woodson was given the provisional diagnosis of cervicalgia and referred to a physical therapist one time per week for six visits.

20.     Upon information and belief, a mass was missed on the MRI images.

21.     On March 27, 2017, Mr. Woodson presented to Piedmont Spine and Neurosurgical for an appointment with Dr. McPherson. It was noted that Mr. Woodson was being seen for complaints of pain "located in his axial spine with radiation to the base of his skull" that began about 3 months prior. Dr. McPherson's notes indicate that she reviewed the C spine MRI images and saw no "clear neural abnormality to cause his pain." It is further noted that Dr. McPherson believed the pain to be musculoskeletal in nature. Mr. Woodson was encouraged to complete physical therapy and was referred to pain management. Additionally, Mr. Woodson was prescribed Mobic and Norco and told to follow up in 3 months.

22.     Upon information and belief, a mass was again missed on the MRI images.

23.     On April 4, 2017, Mr. Woodson saw Dr. Michael Grier at Piedmont Comprehensive Pain Management. Mr. Woodson's pain was noted to be constant and worse by the end of the day. No numbness or weakness in extremities was noted. Additionally, Dr. Grier noted that physical therapy, transcutaneous electrical nerve

stimulation, and pain counseling had not been helpful. It was further noted that Dr. Grier was consulted by Dr. McPherson for the possibility of an epidural steroid injection series. Ultimately, he was prescribed Celecoxib to replace his Meloxicam and Diclofenac and was prescribed Baclofen.

24. On May 16, 2017, Mr. Woodson returned to Dr. Grier's office for "right cervical facet joint injections" due to continued severe headaches and neck pain with "marked tenderness over the cervical facet joint region." Four levels were injected, and Mr. Woodson was discharged, having tolerated the procedure well.

25. On May 23, 2017, Mr. Woodson returned to Dr. Grier's office for "bilateral occipital nerve blocks." Mr. Woodson tolerated the procedure well and was discharged.

26. On June 13, 2017, Mr. Woodson was again seen by Dr. Grier. It was noted that the occipital nerve blocks had provided 2 days of relief, but his pain levels had slowly returned to preinjection levels. Dr. Grier scheduled a second round of facet joint injections and bilateral occipital nerve blocks. Additionally, Dr. Grier's notes mention a discussion regarding the "potential benefits of cervical medial branch nerve radiofrequency lesioning procedures," should Mr. Woodson not receive relief from injections.

27. On June 15, 2017 Mr. Woodson underwent bilateral occipital nerve blocks performed by Dr. Grier. Mr. Woodson then returned on July 25, 2017 for cervical facet joint injections performed again by Dr. Grier.

28. At his follow up appointment on July 27, 2017, Mr. Woodson reported "only 20% to 30% reduction in right side neck pain and no change in the pain that radiates to the top of his scalp from the base of his skull." Additionally, Mr. Woodson noted that Tramadol, Celebrex and Bacloflen provided minimal relief. Dr. Grier scheduled Mr.

Woodson to return for a "right C20C3, C3-C4, C4-C5, and C5-C6 cervical medial branch nerve radiofrequency ablation under fluoroscopy." This procedure was performed on August 24, 2017 and tolerated well. However, at his follow up on October 12, 2017, Mr. Woodson reported "60% to 65% reduction in neck pain, but no real reduction in cervicogenic headaches." Mr. Woodson's pain was again noted as constant. He was prescribed Belbuca, as no other medications were controlling his pain. There was a discussion about the potential for occipital nerve radiofrequency ablation. However, the APRN noted that Dr. Grier had not performed this procedure and may opt not to.

29.    Mr. Woodson continued to follow up with Dr. Grier's office with the same complaints of uncontrollable headaches and neck pain. On December 14, 2017, Mr. Woodson underwent bilateral occipital nerve blocks performed by Dr. Grier.

30.    On January 4, 2018, Mr. Woodson presented to Dr. William Steigerwald at Southern Eye associates with complaints of sudden onset double vision 3 weeks prior. Dr. Steigerwald noted that Mr. Woodson tried to see his neurologist, but the next appointment was in 6-7 months. It is further noted that Dr. Steigerwald advised Mr. Woodson to keep that appointment and scheduled an immediate MRI for "recent onset of diplopia."

31.    An MRI was completed the following day, January 5, 2018, at Innervision Medical Imaging. The findings were as follows "extensive abnormality involves the clivus, nasopharyngeal tissues, and anterior aspect of the craniocervical juncture. The marrow of the clivus is entirely replaced by abnormal signal and abnormal signal surrounds the odontoid and the craniocervical junction anteriorly. Abnormal tissue within the retropharyngeal space." Dr. Jeffrey Shramek noted a consideration of either a "primary

tumor of the clivus" or a potential primary malignancy that had metastasized to that region. Further noted was the additional possibility of "lymphoma of the nasopharyneal tissues invading the clivus." Upon receipt of these findings, Dr. Steigerwald referred Mr. Woodson to Southeastern Neurosurgical and Spine.

32.     On January 25, 2018, Mr. Woodson saw Dr. Micheal Lynn at Southeastern Neurosurgical and Spine. The problem list was limited to a skull mass. Dr. Lynn's notes state that Mr. Woodson "was found to have an enormous clival lesion with invasion into the cavernous sinuses bilaterally and inferiorly into C1 and C2. Differential diagnosis includes chordoma, chondrosarcoma, less likely metastasis." Dr. Lynn informed Mr. Woodson that he would discuss his case at the Tumor Board the following week and recommended an "occipital cervical fusion followed by combined endoscopic and trans-oral en bloc resection of the tumor." Mr. Woodson was counseled on the extensity of this procedure and that it would likely require a gastric feeding tube. Mr. Woodson was also scheduled for consult at Emory Healthcare.

33.     On January 30, 2018, Mr. Woodson saw Dr. David Adamson at Emory Healthcare for consult regarding his "skull-based lesion." It is noted that Dr. Oyesiku was consulted and that he would be helping with treatment. According to Dr. Adamson's notes an "endoscopic transnasal transsphenoidal" debulking procedure was planned for February 22, 2018.  Dr. Ashley Aiken was consulted to review the January 5, 2018 film. It was her impression that the findings represented "a primary nasopharyngeal carcinoma with direct local extension or metastatic disease." Dr. Aiken further noted that the "heterogeneous enhancement pattern and degree of restricted diffusion" were not "typical

for lymphoma or plasmacytoma," but noted that both were possibilities. A CT of the neck with contrast was recommended for further evaluation.

34. On February 9, 2018, Mr. Woodson returned to Emory for a biopsy of the mass. A biopsy was taken from the nasopharynx/sphenoid sinus. According to Dr. Melissa Bender, the "frozen biopsy indicated carcinoma with a squamous differentiation." The lesion was noted to be aggressive in nature. A CT of the sinuses and neck soft tissue with contrast was also performed at this visit, which noted "a large aggressive and destructive mass essentially replacing the right greater and left clivus." Ultimately, it was decided that Mr. Woodson would not be a good candidate for surgery.

35. At his initial visit with Dr. Dobbs at Tennessee Cancer Specialists on February 28, 2018, it was noted that induction therapy "as per given in TAX 324 study" followed by chemotherapy would likely be the best course.

36. The USA's (and that of its agents and servants) failure to adequately provide proper care to Mr. Woodson resulted in the missed diagnosis of cancer, which allowed it to go unrecognized, untreated, and to metastasize.

### FOR A FIRST CAUSE OF ACTION
(Personal Injury / Negligence / Gross Negligence / Recklessness)

37. Plaintiffs hereby incorporate by reference and re-allege every allegation in Paragraphs 1 – 35 of this Complaint as if fully set forth herein

38. The negligent, grossly negligent and/or reckless actions of Dorn's agents, servants, and employees, led to the injuries and damages suffered by the Plaintiffs.

39. The Defendant, through its agents and/or employees, undertook the duty to render medical care to Mr. Woodson in accordance with prevailing and acceptable professional standards of care in the national community.

40. Notwithstanding said undertaking, and while Mr. Woodson was under the care of Defendant's agents and/or employees, the Defendant's agents and/or employees departed from prevailing and acceptable professional standards of care in the treatment of Mr. Woodson, and are thereby negligent, careless, grossly negligent, reckless, and acted in violation of the duties owed to him.  As such, Defendant is liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

   a. In failing to properly read the MRI film on February 21, 2017;
   b. In failing to properly diagnose and treat the patient;
   c. In failing to promptly diagnose and treat the patient;
   d. In failing to promptly notify the patient that he had an unknown mass;
   e. In failing to meet the ordinary and customary standards of care; and
   f. In such other particulars as will be later determined through discovery and the trial of this case.

41. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departure from the professional standards of care by Defendant and its physicians, nurses, agents, and/or employees as noted above, Mr. Woodson suffered severe injuries which ultimately caused him to suffer wounded feelings, shock, pain and suffering, and other damages allowed to be recovered pursuant to this cause of action.  Plaintiff is therefore entitled to recover from Defendant a sum of money to compensate him for all damages allowable under this cause of action.  All damages should be in an amount determined by a judge at trial.

**FOR A SECOND CAUSE OF ACTION**
(Loss of Consortium)

42. Plaintiff hereby incorporates by reference and re-alleges every allegation in Paragraphs 1 – 40 of this Complaint as if fully set forth herein.

43.  As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departure from the professional standards of care by Defendant and its physicians, nurses, agents, and/or employees as noted above, Mrs. Woodson, the wife of Mr. Woodson, has suffered the loss of society, companionship, services, and affection from her husband.  Accordingly, the Plaintiff, Mrs. Woodson, is entitled to recover damages from the Defendant based upon her loss of society, companionship, services and affection in a sum of money to compensate her for all damages allowable under the action for Loss of Consortium.   All damages should be in an amount determined by a judge at trial.

### FOR A THIRD CAUSE OF ACTION
### (General Negligence)

44.  Plaintiff hereby incorporates by reference and re-alleges every allegation in Paragraphs 1 – 42 of this Complaint as if fully set forth herein.

45.  The Defendant and its physicians, nurses, agents, and/or employees undertook the duty to render care to the Plaintiff in accordance with the prevailing professional standards in the national community.

46.  The Defendant and its physicians, nurses, agents, and/or employees have a duty to notify its patients of any abnormalities that can have an impact on the patient's health, including, but not limited to, an unknown mass.

47.  "[At] all times, the medical professional must 'exercise ordinary and reasonable care to ensure that no unnecessary harm [befalls] the patient.'"  Id. at 178, 758 S.E.2d at 504 (further citations omitted).

11

48. "The statutory definition of medical malpractice found in section 15-79-110(6) does not impact medical providers' ordinary obligation to reasonably care for patients with respect to nonmedical, administrative, ministerial, or routine care." Id.

49. "Thus, medical providers are still subject to claims sounding in ordinary negligence." Id.

50. Notwithstanding said undertaking, and while Plaintiff was under Defendant's care, and that of its physicians, nurses, agents, and/or employees, said Defendant, and its physicians, nurses, agents, and/or employees departed from prevailing and acceptable professional standards of routine, ministerial, administrative, and/or non-medical care and treatment by failing to properly and promptly notify the Plaintiff that an unknown mass was present and were thereby negligent, careless, grossly negligent, reckless and in violation of the duties owed to Plaintiff and are therefore liable for the act of omission and/or commission.

51. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departure from the professional standards of care by Defendant and its physicians, nurses, agents, and/or employees as noted above, Mr. Woodson suffered severe injuries which ultimately caused him to suffer wounded feelings, shock, pain and suffering, and other damages allowed to be recovered pursuant to this cause of action. Plaintiff is therefore entitled to recover from Defendant a sum of money to compensate him for all damages allowable under this cause of action. All damages should be in an amount determined by a judge at trial.

Wherefore, Plaintiffs pray for judgment against the USA for actual damages and consequential damages in an amount to be determined by a judge at trial, and for the

costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

                PARHAM SMITH & ARCHENHOLD, LLC

                /s/ Ashlee Edwards Winkler
                Ashlee Edwards Winkler, #100921
                S. Blakely Smith, #14140
                Mackenzie G. "Brooke" Archenhold, #70517
                P.O. Box 2800
                Greenville, SC 29602
                864/242-9008
                awinkler@parhamlaw.com
                bsmith@parhamlaw.com
                barchenhold@parhamlaw.com
                Attorneys for the Plaintiffs

Dated: 04-01-2020
Greenville, South Carolina